# Third District Court of Appeal

## State of Florida

Opinion filed October 25, 2023.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D21-2117
Lower Tribunal No. 20-8291
_____

**AFP 103 Corp.,**
Appellant,

vs.

**Common Wealth Trust Services, LLC,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Valerie R. Manno Schurr, Judge.

Carlton Fields, P.A., Christopher W. Smart (Tampa), Dean A. Morande (West Palm Beach), Rachel A. Oostendorp and Michael G. Zilber, for appellant.

Silver Law, P.A., and Scott A. Silver; Russo Appellate Firm, P.A., and Paulo R. Lima, for appellee.

Mrachek Fitzgerald Rose Konopka Thomas & Weiss, P.A., and Manuel Farach (West Palm Beach), for Florida Land Title Association, Inc., as amicus curiae.

Ausley McMullen, and Benjamin B. Bush (Tallahassee), for Florida Home Builders Association, as amicus curiae.

Before FERNANDEZ, MILLER, and BOKOR, JJ.

PER CURIAM.

## ON MOTION FOR REHEARING

This matter comes to us on AFP 103 Corporation's ("AFP") motion for rehearing. We grant the motion for rehearing in part, withdraw our prior opinion, and issue the following opinion in its stead.

AFP appeals the trial court's "Order Granting Third-Party Plaintiff Common Wealth Trust's Motion for Final Summary Judgment," as well as the trial court's Order denying AFP's Motion for Rehearing or Reconsideration. For the following reasons, we affirm the order granting Common Wealth Trust's motion for final summary judgment as well as the trial court's order denying AFP's motion for rehearing and reconsideration.

In the action below, AFP sought to establish that its property possessed an interest as the dominant estate for certain easements for ingress and egress and parking over a parcel of land that Common Wealth Trust owns. Earlier in the litigation, another property owner made similar claims; summary judgment was entered against that other property owner and for Common Wealth—no appeal was taken. Ultimately, AFP's claims for the easements came before the trial court on Common Wealth Trust's motion for summary judgment which the trial court granted.

We have carefully reviewed the series of deeds, declarations, and supplemental declarations upon which AFP's claims are based. In each instance, the language, the absence of required signatures, the timing of the instruments, and other defects undercut the interpretation that AFP puts forward for its claims. See., e.g., 2000 Presidential Way, LLC v. Bank of N.Y. Mellon, 326 So. 3d 64, 70 (Fla. 4th DCA 2021) ("[T]he doctrine of incorporation by reference is generally limited to documents that actually exist at the time of the incorporation. . . . 'Incorporation by reference pulls existing material into the new, incorporating contract; it does not push material terms into nonexistent, as-yet-unassented-to future contracts.'").

Under the particular facts of this case, therefore, we find no error in the trial court's grant of summary judgment.

Affirmed.

FERNANDEZ and BOKOR, JJ., concur.

MILLER, J., dissenting.

I am compelled to respectfully dissent. In today's decision, the majority voids easements for parking and ingress and egress that Miami-Dade County required by special resolution as a condition precedent to condominium development nearly forty years ago. The easements were set forth in a series of duly recorded documents and expressly incorporated into a warranty deed transferring ownership of the servient tract. Citing nebulous deficiencies, the majority grants an unprecedented windfall to the entity that acquired the servient parcel through a foreclosure sale with actual and constructive notice of the rights of the dominant tracts. The result is to divest the common interest community of parking and a means of ingress and egress and, on a larger scale, to undermine the stability and predictability essential to the success of common interest community development in Florida.

**Background and Procedural History**

This dispute traces its origins to the development of a mixed-use condominium venture, known as the Miami International Merchandise Mart, on contiguous parcels of land in Miami-Dade County. In 1981, the County issued a resolution approving the project and granting an unusual use "to permit non-commercial parking on contiguous property under the same ownership in a

4

district more restrictive than the use it serves is located." In accord with section 33-257 of the Miami-Dade County Code, the resolution was expressly conditioned upon the filing of a unity of title containing words "to the effect that the subject property will be developed and incorporated and maintained with the primary merchandise marked property." The County further required the submission of "a plot use plan . . . to include among other things . . . parking areas."

A document entitled "Unity of Title" was duly prepared and recorded in the Public Records of Miami-Dade County. The Unity of Title expressly prohibited severance of title unless contiguous parking needs were addressed. This restriction was identified as a "covenant running with the land," retaining "full force and effect" on successors in interest until "released in writing by the Director of the Dade County Building and Zoning Department."

For reasons indiscernible from the record, development stalled, and on March 29, 2004, South Florida Hotel (the "Developer") executed and recorded a Declaration of Restrictive Covenants in Lieu of Unity of Title (the "Covenant in Lieu") in conjunction with a second application for site approval. The Covenant in Lieu contemplated the property would be initially subdivided into two lots, the Non-Condominium Lot and Mart Condominium Lot (housing individually owned units), and that portions of the Non-Condominium Lot would

5

be subject to later conveyance or development. It reserved reciprocal easements on each parcel for ingress and egress, parking, and passage of vehicles.[1]

---

[1] The document provided, in relevant part:

> Owner contemplates that the Property will initially be subdivided into two (2) separate lots consisting of the "Non-Condominium Lot" and the "Mart Condominium Lot" . . . .
>
> . . . .
>
> Owner anticipates that title [to the different lots] will not remain in single ownership and is therefore executing this instrument in order to assure the County that the development of the Property with future multiple ownership will not violate the Zoning Code of Miami-Dade County.
>
> . . . .
>
> In the event of multiple ownership subsequent to site plan or amended site plan approval, each of the subsequent owners, mortgagees and other parties in interest shall be bound by the terms, provisions and conditions of this instrument. Owner further agrees that it will not convey portions of the Property to such other parties unless said portions of the Property are bound by, and subject to, the Master Covenants, which for the purposes hereof Article Four of the Master Covenants shall be deemed to be the "Easement and Operating Agreement" required by Section 33-257 of the Code of Miami-Dade County and which shall contain, among other things
> (i)　easements in the common area of each parcel for ingress to and egress from other parcels;
> (ii)　easements in the common area of each parcel for the passage and parking of vehicles;
> (iii)　easements in the common area of each parcel for the passage and accommodation of pedestrians;

Less than a month later, the Developer recorded a second document, entitled "Declaration of Covenants, Conditions, Restrictions, Easements and Operating Agreement for Miami International Merchandise Mart, Hotel Plaza and Convention Center" (the "Declaration of Covenants"), in the Public Records of Miami-Dade County. The Declaration of Covenants tracked the language of section 33-257 of the County Code, which requires a developer to obtain written approval from the Office of the County Attorney prior to modifying an approved site plan.

The Declaration of Covenants created easements for parking over areas designated as the "Shared Essential Components" and "Shared Facilities" and reiterated that the Non-Condominium Lot and Mart Condominium Lot would "be under separate ownership." The Non-Condominium Lot owner was specifically required to "accommodate, within the Shared Essential Components, the reasonable parking needs of the Mart Condominium Lot." Similarly, all owners and condominium unit owners were granted easements

(iv)   easements for access roads across the common area of each parcel to public and private roadways;

. . . .

(xiii)  appropriate agreements between the owners of the several parcels as to the obligation to maintain and repair all private roadways, parking facilities, common areas and the like.

7

for vehicular ingress and egress within the Shared Essential Components and Shared Facilities.

In late 2005, the Developer subdivided the Non-Condominium Lot into two parcels, the Non-Condominium Lot and Undeveloped Lot.[2] To account for the planned parking easement, the Developer, along with MIMM Master Association, Inc. and MIMM Condominium Association, Inc. (collectively the "Associations"), executed a Supplemental Declaration to the Declaration of Covenants, Conditions, Restrictions, Easements and Operating Agreement for Miami International Merchandise Mart, Hotel Plaza and Convention Center (the "Supplemental Declaration").

The Supplemental Declaration required the owner of the newly created Undeveloped Lot to maintain a minimum of 583 parking spaces for use by condominium unit owners, tenants, and guests of the Mart Condominium Lot and Non-Condominium Lot.[3] The execution date remains unclear on this

---

[2] The Supplemental Declaration defined "Lots" as the "Mart Condominium Lot," "Non-Condominium Lot," and "Undeveloped Lot."

[3] The Supplemental Declaration provides:

> Notwithstanding anything to the contrary contained herein, the NCL ["Non-Condominium Lot"] Owner shall not grant to specific Condominium Unit Owners, or other Owners or occupants of the Properties or to the Master Association or to any Condominium Association, the exclusive right to use, in the aggregate, more than one (1) parking space for each 1,000 square feet of improvements located on the Mart Condominium Lot. NCL Owner agrees to grant

8

record, but the face of the Supplemental Declaration bore a date of September 2005.

On October 3, 2005, the Developer executed a Warranty Deed

---

to the Condominium Units listed on <u>Schedule A</u> the exclusive right to use the number of parking spaces set forth <u>Schedule A</u>.

. . . .

The Undeveloped Lot Owner shall not have the right to modify the Site Plan as it relates to the Undeveloped Lot or make any alterations to or construct any improvements on the Undeveloped Lot or otherwise develop the Undeveloped Lot that would result in the number of parking spaces that are located on the Undeveloped Lot being less than the 583 parking spaces currently located on the Undeveloped Lot without, in each instance, the prior written consent of the NCL Owner and any mortgagee of the Non-Condominium Lot, provided that the NCL Owner shall consent to any such development provided that the Undeveloped Lot Owner (a) either (i) constructs sufficient parking in its new development on the Undeveloped Lot to satisfy all zoning and other land use requirements with respect to the Non-Condominium Lot and grants the exclusive right to use not less than 583 parking spaces within its new development on the Undeveloped Lot to the Owners of the Non-Condominium Lot and the Condominium Mart Lot in a Supplemental Declaration or other covenant and/or easement agreement running with the land and to be recorded in the public records or (ii) constructs a parking structure on the Non-Condominium Lot containing not less than 583 parking spaces for the exclusive use of the Non-Condominium Lot, (b) complies with all zoning, land use and other legal requirements and the Covenant in Lieu, or obtains a variance or release therefrom, as applicable, and (c) otherwise complies with all of the terms, conditions and provisions of the Declaration, including obtaining any consents required by <u>Articles 3</u> and <u>4</u> thereof, and obtaining the approval of Miami-Dade County as required therein.

conveying two of the three parcels, the Mart Condominium Lot and Non-Condominium Lot, to SF Hotels, Inc. The Warranty Deed specifically referenced the Supplemental Declaration and stated that the property was conveyed "[t]ogether with the Declarant's and Non-Condominium Lot (NCL) Owner's rights" set forth in the Declaration, as amended, and the Supplemental Declaration. The Warranty Deed was recorded on October 12, 2005, and the Supplemental Declaration was recorded on November 1, 2005. Meanwhile, the Developer retained title to the Undeveloped Lot.

On March 20, 2007, the Developer recorded a Corrective Warranty Deed, correcting the legal description contained in the Warranty Deed. On August 11, 2009, appellant, AFP 103 Corp., acquired the Non-Condominium Lot from SF Hotels.

More than a decade later, the Developer lost ownership of the Undeveloped Lot in foreclosure proceedings. Common Wealth Trust Services, LLC acquired title to the property and, despite having notice of the recorded easements, fenced and blocked the Undeveloped Lot.[4] The Associations attempted to resolve the dispute through nonjudicial means, but to no avail. They then filed suit on behalf of the condominium owners seeking declaratory

---

[4] The operative deed was recorded in the Public Records of Miami-Dade County on June 27, 2019. The title insurance policy issued in conjunction with the transaction contains a specific exception for the Declaration of Covenants and the Supplemental Declaration.

10

and injunctive relief.

Common Wealth Trust filed a counterclaim and moved for summary judgment on three grounds: (1) the easement was invalid under the common law doctrine of merger; (2) the easement documents were ineffective because they ran afoul of the Miami-Dade County Code; and (3) the Supplemental Declaration was not properly incorporated into the 2005 Warranty Deed.

Shortly before the summary judgment hearing, the Associations' attorney withdrew. The trial court granted the motion for summary judgment, and Common Wealth Trust subsequently filed a third-party complaint against AFP seeking to quiet title. AFP answered and asserted several equitable affirmative defenses, including estoppel, laches, and waiver.

Invoking the previous summary judgment order, Common Wealth Trust moved for summary judgment against AFP. AFP filed a counterclaim contending that, if the express easement failed, it was entitled to an equitable easement. The trial court entered final judgment in favor of Common Wealth Trust, and the instant appeal ensued.

## Analysis

### *The Law of Easements*

Rooted in contract law, an easement is defined as "a legal or equitable right acquired by the owner of one piece of land to use another's land for a

11

special purpose." <u>Easement</u>, Garner's Dictionary of Legal Usage (3d ed., Oxford 2011). Such a right may be created by express grant, implication, or prescription. <u>Dinkins v. Julian</u>, 122 So. 2d 620, 622 (Fla. 2d DCA 1960).

It is well-settled that no magical language is required to create such an easement. <u>See</u> <u>Am. Quick Sign, Inc. v. Reinhardt</u>, 899 So. 2d 461, 465 (Fla. 5th DCA 2005). "All that is necessary are words showing the intention of the parties to create an easement on a sufficiently identifiable estate." <u>Hastie v. Ekholm</u>, 199 So. 3d 461, 463 (Fla. 4th DCA 2016) (quoting <u>Branscombe v. Jupiter Harbour, LLC</u>, 76 So. 3d 942, 947 (Fla. 4th DCA 2011)).

Consistent with these principles, a binding servitude is created "if the owner of the property to be burdened . . . enters into a contract or makes a conveyance intended to create a servitude that complies with [the statute of frauds or an exception thereto]" or "conveys a lot or unit in a general-plan development or common-interest community subject to a recorded declaration of servitudes for the development or community." Restatement (Third) of Prop.: Servitudes § 2.1(1) (Am. L. Inst. 2000).

An express easement is construed as a contract. <u>See</u> 28A C.J.S. <u>Easements</u> § 71 n.16 (2023). "[I]f the language is clear, concise, and unambiguous, [courts] must give effect to the terms as stated without resort to other rules of construction to ascertain their meaning." <u>Am. Quick Sign, Inc.</u>,

12

899 So. 2d at 465.  Conversely, "[i]f the provisions are ambiguous, extrinsic evidence may be examined to determine the intent of the parties at the time the document establishing the easement was created."  Id.

***The Effect of Recordation***

"A recorded easement, like a mortgage, places the world on notice that the easement owner has an interest in the described property."  Stinnett v. Dodson, 575 So. 2d 1350, 1351 (Fla. 2d DCA 1991).  No specific form of document is necessary.  Hynes v. City of Lakeland, 451 So. 2d 505, 511 (Fla. 2d DCA 1984); see also 28A C.J.S. Easements § 71 (2023).  Once recorded, an easement is binding on all grantees of the servient estate.  See 28A C.J.S. Easements § 133 (2023).

***The Easement Documents in the Instant Case***

Against this landscape, the unusual use approval and Unity of Title in this case presciently forecast the parking needs intrinsically associated with the proposed common scheme of development.  The developer was required to account for parking and ingress and egress.

Consistent with the conditions of site approval, the Covenant in Lieu, Declaration of Covenants, and Supplemental Declaration created future easements over the Shared Essential Components and Shared Facilities for the benefit of the Mart Condominium Lot and Non-Condominium Lot.  The

13

Warranty Deed, in turn, conveyed title to SF Hotels subject to the Declaration of Covenants, as supplemented by the Supplemental Declaration. The Corrective Warranty Deed expressly referenced the substance of the easements.

The documents establish and reestablish the intent to encumber the servient tracts and create easements for the benefit of the owners of the dominant lots. Indeed, the Warranty Deed, standing alone, sufficiently satisfies the easement creation requirements delineated in the Restatement. See Restatement (Third) of Prop.: Servitudes § 2.1 (Am. L. Inst. 2000). Because the terms of the easements are unambiguous, the court "must give effect to the terms as stated without resort to other rules of construction to ascertain their meaning." Am. Quick Sign, Inc., 899 So. 2d at 465.

Moreover, Common Wealth Trust "[took] the land subject to the easement[s]" because it acquired title with constructive notice of the recorded easements and deeds and actual notice of the title insurance policy, which expressly excepted the Declaration of Covenants as supplemented by the Supplemental Declaration. 28A C.J.S. Easements § 133 (2023); see also Restatement (Third) of Prop.: Servitudes § 4.10 cmt. c, illus. 1 (Am. L. Inst. 2000) (explaining easement "for ingress and egress" entitles grantee "to use the road 24 hours a day by any form of transportation that does not inflict

14

unreasonable damage or unreasonably interfere with the enjoyment of [the servient estate]"); Hayslip v. U.S. Home Corp., 336 So. 3d 207, 210 (Fla. 2022) ("[A] deed covenant may be enforced against a successor grantee so long as the successor grantee had notice of the covenant . . . ."). Consequently, the easements are fully enforceable.

### The Viability of the Supplemental Declaration

The majority, however, has ostensibly determined that the Supplemental Declaration is unenforceable because it was recorded after the Warranty Deed. This conclusion conflates recording with execution. Irrespective of this misconstruction, recording is not necessary to enforce an easement between grantors and grantees or successors in interest with notice. See Townsend v. Morton, 36 So. 3d 865, 869 (Fla. 5th DCA 2010) ("The fact that a deed is unrecorded does not affect the efficacy or validity of the instrument as between the grantor and grantee or those with notice."). Further, the Supplemental Declaration repeatedly reflects it was executed in "September 2005," and there is no record support for any contrary proposition.[5] Consequently, at a minimum, a factual issue precluded summary judgment on this basis.

### The Equitable Defenses and Counterclaim

Further, it is axiomatic that "[w]here a party has not filed a summary

---

[5] The Supplemental Declaration predates the controlling Corrective Warranty Deed.

15

judgment motion or where no notice or opportunity to be heard has been given to the opposing side to present opposing affidavits, a trial court may not sua sponte grant summary judgment in favor of the non-movant." Ness Racquet Club, LLC v. Ocean Four 2108, LLC, 88 So. 3d 200, 202 (Fla. 3d DCA 2011). In this case, Common Wealth did not move for summary judgment on the counterclaim. It could not do so because its summary judgment motion predated the counterclaim. Nor did it file record evidence addressing the equitable defenses. Under our precedent, this alone warrants reversal. See Hotel 71 Mezz Lender, LLC v. Tutt, 66 So. 3d 1051, 1054 (Fla. 3d DCA 2011); Royal Harbour Yacht Club Marina Condo. Ass'n, Inc. v. Maresma, 304 So. 3d 1268, 1269 (Fla. 3d DCA 2020); OTI Fiber, LLC v. CenterState Bank, N.A., 326 So. 3d 743, 747 (Fla. 2d DCA 2021); Alejandre v. Deutsche Bank Tr. Co. Americas, 44 So. 3d 1288, 1289 (Fla. 4th DCA 2010).

***Conclusion***

By disregarding the conditions of site development approval and the intent of the parties, as evidenced by decades-old duly recorded documents, the majority releases a rash of uncertainty into commercial real estate transactions. The ripple effect of this decision will undoubtedly be felt not only by developers seeking to effectively navigate through the challenges inherent in planning multi-parcel common interest communities, but also the title

16

insurance industry.

Accordingly, I respectfully dissent.